IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

WESTPORT INSURANCE CORPORATION §
§
VS. § CIVIL ACTION NO. 4:07-CV-664-Y
§
COTTEN SCHMIDT, LLP, ET AL. §

ORDER GRANTING DEFENDANT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT AND STAY
(with special instruction to the clerk of Court)

Pending before the Court is Defendants' Motion for Partial Summary Judgment (doc. #17). Also before the Court is Plaintiff's Response and Cross-Motion for Summary Judgment (doc. #20). After review of the motions, the Court concludes that Westport owes a duty to defend and that the question of the duty to indemnify is not justiciable at this point. The Court, therefore, DENIES Plaintiff's motion for summary judgment and GRANTS defendants' motion for partial summary judgment. The Court also GRANTS the defendants' request for a stay of this case until related state-court proceedings are resolved.

I. Background

This declaratory-judgment action is an insurance-coverage dispute between plaintiff Westport Insurance Corporation and defendants Cotten Schmidt, LLP ("Cotten Schmidt"); Robert D. Martinez; and Randall D. Schmidt (collectively "the Cotten Schmidt defendants"). The suit arises out of two related Texas state-court cases. On September 5, 2005, defendants Martinez and Schmidt, attorneys employed by Cotten Schmidt, filed suit in the 141st Judicial District Court, Tarrant County, Texas, on behalf of Alan

Bell in the case of *Alan Bell v. Robert Russell*, Cause No. 141-214085-05 ("the Bell litigation"). (Def. Mtn. App. at 2.) Empire Equipment, Inc. ("Empire"), intervened in this law suit.

The Bell litigation was based on an alleged business arrangement between Bell and Robert Russell by which Bell was to finance Russell's purchase of certain oilfield equipment on behalf of Empire. (*Id.* at 2-3) Russell was to rent the equipment out for a time and then resell the equipment. (*Id.* at 2.) Apparently, Bell and Russell's business relationship soured, resulting in Bell's filing suit against Russell alleging "breach of fiduciary duty, money had and received, and constructive trust." (*Id.*)

Martinez and Schmidt eventually obtained default judgments in favor of Bell in the Bell litigation. Their actions in obtaining the default judgments gave rise to the second state-court suit related to the instant case. Russell and Empire filed suit in the same state district court, in Cause No. 048-226057-07 ("the underlying suit"), against Cotten Schmidt, Martinez and Schmidt, alleging wrongful execution, levy and sale, and conversion based on various improprieties in their pursuit of the default judgments. In their state-court suit, Russell and Empire allege Martinez and Schmidt obtained an order allowing substituted service as to Russell but failed to strictly comply with that order. (*Id.* at 2-3.) It is further alleged that Martinez stated in open court that the substitute-service order had been complied with even though Martinez and Schmidt "knew, or should have known, and are charged with knowledge of, the fact that the statement was untrue, and no

2

proper service had been done." (*Id.* at 3.)

Martinez and Schmidt also obtained a writ of attachment on seven pieces of Empire's equipment. (*Id.*) Russell and Empire contend that the two default judgments entered in the underlying litigation were interlocutory and limited the relief available to Bell, Martinez and Schmidt. (*Id.* at 3-4.) The relief available under the default judgments did not, according to Russell and Empire, include a option of selling the seven pieces of equipment subject to a writ of attachment. (*Id.* at 3.) Russell and Empire allege that, despite this, Martinez and Schmidt convinced the Harris County constable to sell the equipment at auction. (*Id.* at 4.) Russell and Empire further contend that the equipment was sold for "millions of dollars" less than its true value and that Schmidt impermissibly participated in the auction. (*Id.*) The damages sought by Russell and Empire in the underlying litigation include the value of the equipment above its auction selling price and the revenue that would have been generated by renting the equipment. (*Id.* at 5.)

After the auction, Russell appeared before the state court and had both default judgments vacated for lack of proper service. (*Id.* at 4-5.) Russell and Empire assert that as part of the proceedings to vacate the judgments Martinez and Schmidt "stated on the record, and in filings, that the [default judgment] was in fact a final judgment [even though] Defendants knew, or should have known that such statements were untrue." (*Id.* at 4.)

As to the suit now before this Court, Westport provided Cotten

Schmidt a "Customized Practice Policy" ("the policy") effective July 15, 2006, through July 15, 2007. (Pltf. Mtn. App. at 1.) Westport filed this declaratory-judgment action seeking a declaration that, pursuant to certain exclusions in the policy and the fact that the underlying suit does not allege a "wrongful act" as required by the policy, it has no duty to defend or indemnify Cotten Schmidt and its attorneys regarding the claims in the underlying suit.

On May 19, 2008, Cotten Schmidt, Martinez and Schmidt filed their motion for partial summary judgment requesting that the Court conclude as a matter of law that Westport has a duty to defend them in the underlying litigation. Westport has since filed its response and its own motion for summary judgment on the duty-to-defend issue. Both motions are now before the Court.

II. Legal Standards

A. Summary-Judgment Standard

When the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," summary judgment is appropriate. FED. R. CIV. P. 56(c). An issue is considered "genuine" if "it is real and substantial as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo Cty.*, 246 F.3d 481, 489 (5th Cir. 2001). Facts are considered "material" if they "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To determine whether there are any

genuine issues of material fact, the Court must first consult the applicable substantive law to ascertain what factual issues are material. *Lavespere v. Niagra Mach. & Tool Works*, 910 F.2d 167, 178 (5th Cir. 1990). Next, the Court must review the evidence on those issues, viewing the facts in the light most favorable to the nonmoving party. *Id.; Newell v. Oxford Mgmt. Inc.*, 912 F.2d 793, 795 (5th Cir. 1990).

In making its determination on the motion, the Court must look at the full record including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. *See* FED. R. CIV. P. 56(c); *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988). Rule 56, however, "does not impose on the district court a duty to sift through the record in search of evidence to support" a party's motion for, or opposition to, summary judgment. *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). Thus, parties should "identify specific evidence in the record, and . . . articulate" precisely how that evidence supports their claims. *Forsyth v. Barr*, 19 F.3d 1527, 1536 (5th Cir. 1994). Further, the Court's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.

To prevail on a summary-judgment motion, the moving party has the initial burden of demonstrating that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party has carried its summary-judgment burden, the

respondent must go beyond the pleadings and by his own evidence set forth specific facts showing there is a genuine issue for trial. *Arbaugh v. Y&H Corp.*, 380 F.3d 219, 222 (5th Cir. 2004) (citing *Celotex*, 477 U.S. at 324); *see also* Fed. R. Civ. P. 56(e). This burden is not satisfied by creating some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249-50.

B.   Texas Insurance Law

Under Texas law, the duty to defend and the duty to indemnify are separate duties. *See Farmers Tex. County Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 82 (Tex. 1997). Thus, an insurer may have a duty to defend but ultimately be found to owe no duty of indemnification. *See id.*

As to the duty to defend, the insured bears the initial burden to establish that his claim is covered. *See Noble Energy, Inc. v. Bituminous Cas. Co.*, 529 F.3d 642, 645 (5th Cir. 2008). In determining whether a claim is covered, and thus a duty to defend owed, Texas follows the "eight-corners" rule. *Id.* That is, in determining whether a duty to defend exists, courts are generally constrained to comparing the four corners of the policy to the four corners of the pleadings in the underlying suit against the insured. *See id.; see also GuideOne Elite Ins. Co. v. Fielder Rd.*

*Baptist Church*, 197 S.W.3d 305, 308 (Tex. 2006). This determination is made without regard to the truth of the allegations in the underlying pleadings. *See Liberty Mut. Ins. Co. v. Graham*, 473 F.3d 596, 599 (5th Cir. 2000). Doubtful cases are resolved in favor of the insured. *United Nat'l Ins. Co. v. Hydro Tank, Inc.*, 497 F.3d 445, 448 (5th Cir. 2007).

Once the insured establishes coverage, the insurer bears the burden of establishing an exclusion applies. *Id.* Insurance policy exclusions are narrowly construed in favor of coverage. *See Nat'l Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991).

III. Analysis

In arguing that it has no duty to defend the Cotten Schmidt defendants in the underlying suit, Westport asserts that the underlying suit does not assert a "wrongful act" as required by the policy. Westport also argues that Martinez and Schmidt's actions in the underlying suit fall within various policy exclusions. Each of these arguments is addressed below.

A. No "Wrongful Act"

At the outset, because Westport bases its arguments on the Texas common-law rule that an attorney generally owes no duty to third parties, a discussion of Texas law on an attorney's liability to third parties is necessary. In *Barcelo v. Elliot*, the Texas supreme court reaffirmed the common-law rule that an attorney in

Texas is not liable to non-client third parties for legal malpractice. *See Barcelo v. Elliot*, 923 S.W.2d 575, 577 (Tex. 1996); *see also Alpert v. Crain, Caton & James, P.C.*, 178 S.W.3d 398, 405 (Tex. App.--Houston [1st Dist.] 2005, pet denied). "At common law, the rule of privity limits an attorney's liability to those in privity with the attorney." *Alpert*, 178 S.W.3d at 405. But although the rule of privity is instructive in this case, Russell and Empire's claims do not sound in malpractice. Instead, Russell and Empire allege that Martinez and Schmidt's actions in the underlying suit amounted to conversion and wrongful levy, execution, and sale. (Def. Mtn. App. at 5-6.) Thus, the Texas legal principles material to the current case are those dealing with attempts by third parties to sue a party opponent's attorney based on the attorney's conduct in previous litigation. These principles will bear on several aspects of the Court's analysis.

"Perhaps as an offshoot of its privity jurisprudence, Texas case law has discouraged lawsuits against an opposing counsel if the lawsuit is based on the fact that counsel represented an opposing party in a judicial proceeding." *Alpert*, 178 S.W.3d at 405 (citing *Bradt v. Sebek*, 14 S.W.3d 756, 766 (Tex. App.--Houston [1st Dist.] 2001, pet. denied)). Similar to the rule of privity, Texas courts have limited an attorney's exposure to liability for third-party claims based on the attorney's actions during litigation in an effort to foster zealous representation. *Compare Barcelo*, 923 S.W.2d at 578-79 (noting preservation of the rule of privity "ensure[s] that attorneys may in all cases zealously represent

their clients without the threat of suit from third parties compromising that representation.") *with Alpert*, 178 S.W.3d at 405-06. Consequently, Texas courts have recognized a form of "qualified immun[ity] from civil liability, with respect to non-clients, for actions taken in connection with representing a client in litigation." *Alpert*, 178 S.W.3d at 405 (citing *Butler v. Lilly,* 533 S.W.2d 130, 131-34 (Tex. App.--Houston [1st Dist.] 1976, writ dism'd)). This immunity focuses on the nature of the attorney conduct at issue, rather than on "whether the conduct was meritorious in the underlying lawsuit." *Id.* at 406 (citing *Renfroe v. Jones & Assocs.*, 947 S.W.2d 285, 288 (Tex. App.--Fort Worth 1997, writ denied)). So long as the attorney is engaged in the conduct at issue as part of the discharge of his duties in representing his client, that conduct is not independently actionable, even if frivolous or without merit. *Id.; see also Renfroe*, 947 S.W.2d at 288 ("Under Texas law, attorneys cannot be held liable for wrongful litigation conduct."); *Bradt v. West*, 892 S.W.2d 56, 71-72 (Tex. App.--Houston [1st Dist.] 1994, writ denied) (concluding no cause of action existed for frivolous motions because there is no duty to be correct in legal arguments).

Westport argues that the actions forming the basis of the underlying suit are not covered by the policy because they are not "wrongful act[s]" as defined by the policy. The policy defines "wrongful act," in relevant part, as "any act, error, omission, circumstance, PERSONAL INJURY or breach of duty in the rendition of legal services for others in the INSURED'S capacity as a lawyer,

and arising out of the conduct of the INSURED'S profession as a lawyer." (Pltf. Mtn. App. at 15.) Westport contends that the underlying suit against Schmidt and Martinez is not against them in their capacity as lawyers, and, therefore, is not based upon a wrongful act covered by the policy.

Westport bases this argument on the common-law rule in Texas that an attorney does not owe a duty to third parties who may be injured by the attorney's negligent misrepresentation. According to Westport, because Russell and Empire, the plaintiffs in the underlying suit, were not Cotten Schmidt's clients, Cotten Schmidt and its attorneys did not owe them any duty of care. Thus, Westport argues that Russell and Empire are not suing Martinez and Schmidt in their capacities as lawyers, but are suing them for their participation in the wrongful sale of the equipment. But, as noted above, Russell and Empire are not suing for malpractice. The common-law rule of privity, therefore, does not bar their suit. Even assuming the rule applies to this case, the equipment was subject to auction because of what Martinez and Schmidt did as attorneys in obtaining default judgments, obtaining a writ of attachment, and executing upon the equipment and, therefore, Martinez and Schmidt's actions would seem to fit within the definition of "wrongful act." Moreover, if the lack of duty owed by the Cotten Schmidt defendants is a valid defense to the underlying suit, the attorney Westport provides can raise it on behalf of Cotten Schmidt there. The fact that a valid defense to the underlying suit exists is not a basis for finding no duty to

defend in the first instance. *See Heyden Newport Chem. Corp. v. S. Gen. Ins. Co.,* 387 S.W.2d 22, 24 (Tex. 1965) (stating that in deciding whether an insurance company has a duty to defend, there is to be no "legal determination" of the underlying complaint); *cf. Liberty Mutual v. Graham*, 473 F.3d 596, 599 (5th Cir. 2006) (noting that a duty to defend is determined without regard to the "truth or falsity of [the] allegations").

More directly bearing on this case is the rule limiting exposure to liability to third-party suits based on an attorney's acts in representing a client. It might be argued that if an attorney cannot be held liable by a third party for conduct in representing a client, the parties to a malpractice insurance policy could not intend for such acts to be covered. But the plain language of the policy does not limit coverage to claims of breach of duty nor to clients of Cotten Schmidt. Instead, as argued by the Cotten Schmidt defendants, the policy extends to "*any* act, error, [or] omission . . . in the rendition of legal services for others in the INSURED's capacity as a lawyer." (Pltf. Mtn. App. at 15.)

And, as a defense, Schmidt and Martinez's qualified immunity from liability does not relieve Westport of its duty to defend. *See West*, 892 S.W.2d at 71-72 (affirming summary judgment granted on the defense of immunity); *Heyden Newport Chem. Corp.,* 387 S.W.2d at 24 (duty to defend evaluated without legal determination of underlying suit). An attorney's immunity is, in fact, limited. *See Alpert*, 178 S.W.3d at 406 (noting a "protection from liability

11

arising out of his representation of a client is not without limits"); *see also McCamish v. F. E. Appling Interests*, 991 S.W.2d 787, 792 (Tex. 1999) (noting that liability under the tort of negligent misrepresentation is based on the breach of the duty created by awareness of a non-client's reliance on the misrepresentation rather than the duty owed to a client and that "an attorney can be subject to a negligent misrepresentation claim in a case in which she is not subject to a legal malpractice claim"). For example, where an attorney engages in "fraudulent or malicious" acts "he is liable for injuries to third parties." *Likover v. Sunflower Terrace II, Ltd.*, 696 S.W.2d 468, 472 (Tex. App.--Houston [1st Dist.] 1985, no writ). This is because such acts are "foreign to the duties of an attorney." *Poole v. Houston & T.C. Ry*, 58 Tex. 134, 137 (1882). That is, an attorney is not justified in engaging in fraud even in the representation of a client. *See id.* at 137-38. Thus, in theory, Schmidt and Martinez's actions could exceed their immunity. *See id.* 137-38, 140 (reversing and remanding to determine if attorney had committed fraud). But as noted above regarding the common-law rule of privity, the lawyers provided by Westport can raise the qualified-immunity defense on behalf of Schmidt and Martinez. And to the extent that Schmidt and Martinez may have been acting outside of their capacity as attorneys, this bears on Westport's duty to indemnify rather than to defend. *See Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 491 (Tex 2008) ("An insurer must defend its insured if a plaintiff's factual allegations potentially support a

covered claim, while the facts actually established in the underlying suit determine whether the insurer must indemnify its insured.").

Finally, Westport argues that the specific act of Schmidt's attendance and participation in the auction is not covered because, as required by the policy, it is not "rendition of legal services." Every act alleged in the petition need not be covered, however, in order for a duty to defend to exist as to the suit as a whole. *See Northfield Ins. Co. v. Loving Home Care, Inc.*, 363 F.3d 523, 528 (5th Cir. 2004) ("If the petition *only* alleges facts excluded by the policy, however, the insurer is not required to defend.") (emphasis added); *see also Zurich Am. Ins. Co.*, 268 S.W.3d at 491 ("If a complaint potentially includes a covered claim, the insurer must defend the entire suit."). The Court, therefore, concludes that the petition in the underlying suit alleges wrongful acts as contemplated by the policy. The Cotten Schmidt defendants have thus met their burden of establishing coverage.


B. "Prior Knowledge" Exclusion

Westport next argues that the Cotten Schmidt defendants' actions fall within the policy's prior-knowledge exclusion. The prior-knowledge exclusion excludes coverage for "[a]ny act, error, or omission, circumstance or PERSONAL INJURY occurring prior to the effective date of this POLICY if any INSURED at the effective date knew or could have reasonably foreseen that such act, error, omission, circumstance or PERSONAL INJURY might be the basis of a

13

CLAIM." (Pltf. Mtn. App. at 8.) In its complaint, Westport asserts that when the default judgments in the Bell litigation were vacated on May 18, 2006, the Cotten Schmidt defendants knew or could have reasonably foreseen that their actions in the Bell litigation might be the basis of a claim against them. (Pltf. Comp. at ¶ 3.12.) The Cotten Schmidt defendants respond that the date that the judgments were vacated--May 18, 2006--does not appear in the underlying petition and that under the Texas eight-corners rule "facts outside of the pleadings, *even those easily ascertained*, are ordinarily not material to the determination" of whether there is a duty to defend. *GuideOne*, 197 S.W.3d at 308 (emphasis added). As a result, Cotten Schmidt argues, Westport cannot establish when Martinez and Schmidt knew or could have reasonably foreseen that their actions in securing the judgments might be the basis of a claim against them.

While the issue of whether the Court could look outside the pleading to ascertain the date when the judgments in the Bell litigation were vacated is not so easily resolved, *see GuideOne*, 197 S.W.3d at 308-09 & nn.1 & 2, Westport has waived the issue by failing to address it in its briefing. *See Magee v. Life Ins. Co. of N. Am.*, 261 F. Supp. 2d 738, 748 (S.D. Tex. 2003). Instead, Westport insists that its arguments are based solely on facts contained in the petition in the underlying suit. (Pltf. Br. at 8.) The Court will, therefore, limit its analysis to those facts alleged in the petition in the underlying suit.

Westport argues that the various acts alleged in the

underlying suit demonstrate that a reasonable attorney in the position of Schmidt and Martinez would have known or could reasonably have foreseen that his actions might be the basis of a claim as of the policy's effective date. Westport notes that the underlying suit alleges Martinez and Schmidt knew, should have known, or are charged with knowledge that service had not been effected in accordance with the substitute-service order but nevertheless represented to the state court that service had been properly effected and took two default judgments based on this misrepresentation. Further, Westport points out that the underlying suit alleges that Martinez and Schmidt knew, should have known, or are charged with knowledge that the default judgments were interlocutory and, therefore, could not be satisfied by sale of the equipment, but that they still persuaded the constable to sell the equipment. Finally, Westport insists that when Russell appeared to challenge the judgments and resulting sale, Martinez represented to the state court that the judgments were final, though he knew or should have known they were interlocutory.

The Cotten Schmidt defendants say that Westport has made similar arguments in relation to its policy's prior-knowledge exclusion in the past, and that such arguments have been rejected. Westport, in the case *Westport v. Atchley*, argued as it does here that the prior-knowledge exclusion relieved it of any duty to defend. The United States District Court for the Eastern District of Texas concluded that determining whether the exclusion applies

entails both a subjective and an objective inquiry. *See Westport Ins. Corp. v. Atchley, Russell, Waldrop & Hlavink, LLP*, 267 F. Supp 2d 601, 608-11 (E.D. Tex. 2003). According to the court in *Atchley*, a court must first determine whether the insured attorney "subjectively knew, prior to the policy period, that his client intended to bring a claim, [regardless of] whether the wrongs alleged were wholly imaginary, were based on a breach of which the attorney was unaware, or were based on breaches of which the attorney was aware." *Id.* at 608. If the insured attorney has subjective knowledge of an impending claim, the prior-knowledge exclusion bars coverage. *Id.* at 611. Absent such knowledge, after determining what facts the attorney subjectively knew, a court must determine "whether a reasonable attorney, in possession of the facts that the insured possessed at the time he applied for insurance, would reasonably foresee both that a professional breach had occurred and that the breach would likely be the basis of a claim against the insured." *Id.* at 609.

Prior to applying *Atchley* to the case *sub judice* certain aspects of that case must be noted. First, *Atchley* deals with the prior-knowledge exception in the context of suit by a client against its own attorneys. The case now before the Court deals with a suit brought by the opposing party. Despite this distinction, the basic principles in *Atchley* are helpful in resolving this case. As discussed above, Texas law contemplates that in some rare occasions third parties, including parties

16

opponent, can maintain an action against an attorney for his conduct during litigation. As also established above, the plain language of the policy's coverage provision encompasses such actions. Thus, whether the suit is brought by a client or a third party, the issue becomes whether the claim is excluded from coverage under the prior-knowledge exception.

*Atchley* purports to base its subjective-objective analytical framework on the language of the prior-knowledge exclusion. And the Court agrees that the language of the exclusion requires an analysis of what an objectively reasonable attorney would expect given the subjective knowledge of the particular attorney involved. But on a specific point regarding the interpretation and application of the prior-knowledge exception the Court must part ways with *Atchley.* In *Atchley*, the court concludes that the prior-knowledge exclusion excludes coverage when an attorney ignores a "*high probability* that his actions will result in a claim." *Id.* at 608 (emphasis added). The *Atchley* court later explains that the exclusion applies "where facts subjectively known to the insured would lead a reasonable attorney to conclude that at least some breach of duty occurred and where those same facts also indicate that the client is dissatisfied to a point that would lead a reasonable attorney to conclude that the client *likely* would file a claim." *Id.* at 611 (emphasis added).

The language of the exclusion, however, excludes coverage when "prior to the effective date of this POLICY . . . any INSURED at

the effective date knew or could have reasonably foreseen that such act, error, omission, circumstance or PERSONAL INJURY *might* be the basis of a CLAIM." (Def. Mtn. App. at 15(emphasis added).) Although establishing that a reasonable attorney would understand that his actions were likely to result in a claim, or that a claim was highly probable, would be sufficient to exclude claims arising from such actions from coverage under the prior-knowledge exclusion, the plain language of the exclusion does not require this level of certainty.[1] Rather, exclusion under the prior-knowledge exclusion is subject to a lower standard in that all that is required is that, based on the subjective knowledge of the actual attorney at issue, a reasonable attorney would understand that his actions "might" be the basis of a claim. There is no basis in law for deviating from this language by requiring a high probability or that a claim be likely. *See Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994) ("Interpretation of insurance contracts in Texas is governed by the same rules as interpretation of other contracts. When construing a contract, the court's primary concern is to give effect to the written expression of the parties' intent.") (citations omitted).

Relatedly, the *Atchley* court concludes that a claim is

---

[1] *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1432 (Merriam-Webster 1986) (defining "might" as expressing "permission, liberty, probability, possibility in the past or a present condition contrary to fact or less probability or possibility than may); *id.* at 1806 (defining "probable" as "based on or aris[ing] from adequate fairly convincing though not absolutely conclusive intrinsic or extrinsic evidence or support; that can reasonably and fairly convincingly be accepted as true, factual or possible without being undeniably so); *id.* at 1310 (defining "likely" as "of such a nature or so circumstances as to make something probable").

18

excluded under the prior-knowledge exclusion if the "facts subjectively known to the insured would lead a reasonable attorney to conclude that a grossly flagrant or glaring breach of duty has occurred." *Atchley*, 267 F. Supp. 2d at 611. The court explains that when an attorney commits a glaring breach, other factors that might be considered, such as whether a client has expressed dissatisfaction with the attorney or the amount of time that has elapsed since the end of representation, are trumped and the attorney should expect a claim. *See id.* at 610. Again, this Court notes that *Atchley* was decided in the context of a malpractice suit by a former client. As a result, the exact factors listed in *Atchley* do not bear on this case. That is, whether an attorney's client has expressed dissatisfaction with the attorney or whether the client has delayed in pursuing a claim are irrelevant to the instant case. But similar factors--such as whether the attorney has come to know that the opposing party contends the attorney's actions are fraudulent or otherwise unlawful--should be considered in cases such as this one. *Cf. Alpert*, 178 S.W.3d at 406 (noting a third party may hold an attorney liable for, inter alia, fraud).

And, more broadly, the language of the exclusion provides that a claim arising from an event "occurring prior to the effective date of the POLICY" is excluded "if any INSURED at the effective date *knew* or *could have reasonably foreseen* that such" events "*might* be the basis of a CLAIM." (Def. Mtn. App. at 15 (emphasis added).) Thus, as discussed in regard to the *Atchley* court's

requirement that an attorney be aware that a claim be highly probable or likely, the plain language of the prior-knowledge exclusion does not require that an attorney be aware of a blatant or glaring violation. Of course, if an attorney was aware of some blatant or glaring act on his part as of the effective date of the policy, claims arising from such act would be excluded. But a blatant or glaring act is not required. Nor must exclusion based on blatant or glaring acts be analyzed separately from the basic subject-objective analysis. An objectively reasonable attorney aware that he engaged in such acts would know that they might be the basis of a claim.

With the foregoing in mind, the Court will proceed with the basic subjective-objective analysis expressed in *Atchley* but will do so in such a way that gives greater effect to the language of the policy. First, the Court will analyze Martinez and Schmidt's subjective knowledge. If, as stated in the exclusion, they subjectively "knew . . . that [their actions] might be the basis of a claim," (Def. Mtn. App. at 15), then the prior-knowledge exclusion will exclude their claims from coverage. Then, if necessary, the Court will evaluate whether a reasonable attorney with Martinez and Schmidt's subjective knowledge would have foreseen that his actions might be the basis of a claim. (*Id.* (excluding coverage where attorney "could have reasonably foreseen" that his actions "might be the basis of a claim).)

As to the first, or subjective inquiry, the petition in the

underlying suit clearly alleges that in the underlying suit Martinez obtained a default judgment after advising the court that a motion authorizing substituted service had been complied with. (Def. Mtn. App. at 3.) Russell and Empire allege that the Cotten Schmidt defendants "knew, or should have known, and are charged with knowledge of, the fact that that statement was untrue." (*Id.*) Russell and Empire also allege that the Cotten Schmidt defendants obtained a writ of attachment by asserting that Russell had not disclosed where the equipment at issue in the underlying suit was located. This was done, according to Russell and Empire, despite the fact that the Cotten Schmidt defendants knew where the equipment was all along. (*Id.* at 2-3.) It is also alleged that the Cotten Schmidt defendants obtained a writ of execution and convinced the Harris County constable to sell the property although the underlying judgment was interlocutory and void for lack of service and the writ did not authorize sale. (*Id.* at 3-4.) Finally, Russell and Empire allege that the Cotten Schmidt defendants knew, should have known, or purposely chose to ignore the fact that the equipment was worth millions of dollars more than what it was sold for. (*Id.* at 4.)

These allegations do not exclude the underlying petition's claims from coverage under the subjective portion of the prior-knowledge exclusion. In *Atchley*, the court noted that various factors that would seem to be relevant under the objective portion of the analysis are not relevant under the subjective portion.

"[I]t does not matter whether any of the following occurred: (1) the attorney did not breach any duty; (2) the attorney did breach a duty but had no knowledge of the breach; or (3) the attorney knew that he had breached a duty." *Atchley*, 267 F. Supp. 2d at 608. Instead, all that matters in determining whether a claim is excluded under the prior-knowledge exclusion due to subjective knowledge is whether "the attorney subjectively knew, prior to the policy period, that his client [might] to bring a claim." *Id.* The petition in the underlying case does not allege or suggest that Martinez and Schmidt had such knowledge. The Court will, therefore, evaluate Martinez and Schmidt's subjective knowledge, as indicated by the petition in the underlying case, to determine whether an objectively reasonable attorney would have foreseen that their actions might give rise to a suit.

Again, Texas law on the qualified immunity of attorneys is implicated. A reasonable attorney in Texas would be aware that, as a general rule, his litigation conduct is not actionable by a third party, including a party opponent. *See Alpert*, 178 S.W.3d at 405. Westport argues that Martinez and Schmidt's actions and representations regarding service of process and the sale of the equipment in the underlying suit are sufficiently glaring or blatant to put a reasonable attorney on notice that his actions might be the basis of a claim. As noted above, it is not required that an attorney's conduct be blatant or glaring for claims arising from such conduct to be excluded. All that is required is that a

reasonable attorney would have foreseen that a claim might be made based on his conduct as of the effective date of the policy.

Had it been alleged in the petition in the underlying suit that Martinez and Schmidt affirmatively misled the state court on these issues, this Court would have no difficulty agreeing with Westport. *See Alpert*, 178 S.W.3d at 406 (an attorney's qualified immunity is limited and does not apply to certain acts, such as fraud); *cf. Chambers v. NASCO, Inc.*, 501 U.S. 32, 42-46, 50-51 (1991) (upholding the district court's use of its inherent authority to sanction bad-faith conduct which included "misleading and lying to the court."); *also cf. Elliott v. Tilton*, 64 F.3d 213, 216 (5th Cir. 1995) (noting court's inherent authority to sanction bad faith conduct); *also cf.* Fed. R. Civ. P. 11. But the petition in the underlying suit does not allege such blatant or glaringly unreasonable conduct. Instead, the petition alleges that Martinez and Schmidt "knew, should have known, or are charged with knowledge of" the fact that service had not been properly effected and that the judgments were interlocutory. Thus, the petition leaves open the possibility that Martinez and Schmidt "should"--but may not have--known that their representations were false or incorrect. Such actions are not actionable by a third party in Texas. *See Alpert*, 178 S.W.3d at 406 (noting an attorney cannot be held liable by a third party for meritless, frivolous, or wrongful litigation conduct). A reasonable attorney would not, therefore, necessarily anticipate that such actions might result in a claim against him by

the opposing party.

To strengthen the impact of the "knew or should have known" allegations in the underlying petition, Westport cites Texas supreme court Justice Nathan Hecht's concurrence in *Universal Life Insurance Company v. Giles*, 950 S.W.2d 48 (Tex. 1997). Therein, Justice Hecht states "knew or should have known . . . requires intentional or reckless conduct." *Univ. Life. Ins. Co. v. Giles*, 950 S.W2d 48, 73 (Tex. 1997) (Hecht, J., concurring). Justice Hecht's statement was made in an attempt to give meaning to an element of the Texas common-law cause of action of bad faith denial of a claim and is thus inapposite to the present case.

Indulging the worst of the allegations in the underlying petition, the acts committed by Martinez and Schmidt were quite severe, making this a difficult and close call. But, so long as any allegations are covered, a duty to defend exists as to all allegations. *See Fidelity & Guar. Ins. Underwriters, Inc. v. McManus*, 633 S.W.2d 787, 788 (Tex. 1982) ("If the petition *only* alleges facts excluded by the policy, the insurer is not required to defend.") (emphasis added); *but see Gulf States Ins. Co. v. Alamo Carriage Serv.*, 22 F.3d 88, 90 (5th Cir. 1994) ("[W]hen the plaintiff's petition makes allegations which, if proved, would place the plaintiff's claim within an exclusion from coverage, there is no duty to defend.") (citing *McManus*). And the Court must construe the petition's allegations liberally and resolving doubt concerning the duty to defend in favor of finding a duty. *See*

*Liberty Mut. Ins. Co. v. Graham*, 473 F.3d 596, 602 n.19 (5th Cir. 2006). Given these standards, the Court concludes that the claims at issue are not excluded under the prior-knowledge exclusion.

C. Property Damage and Loss Exclusion

Exclusion D, the property damage exclusion, precludes coverage for "injury to, or destruction of tangible property or loss of use thereof." (Pltf. Mtn. App. at 31.) Westport argues that the contention of Russell and Empire in the underlying lawsuit that Martinez and Schmidt's actions "deprived [them] of the [auctioned] equipment, worth approximately $2,500,000, and the revenue stream from leasing, in the approximate amount of $3,000,000" is one of "loss of use" subject to this exclusion.

The Cotten Schmidt defendants respond that this allegation is made as part of Russell and Empire's twin claims of conversion and wrongful levy, execution, and sale, both of which amount to a claim that they were completely deprived of the property. They further contend that the exclusion is intended to prevent the malpractice policy from inadvertently extending coverage to property-damage claims such as are typically covered in a commercial general-liability policy. Such policies often define covered "property damage" in terms of "loss of use of tangible property which has not been physically injured or destroyed." *See*, *e.g.*, *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 6 n.5 (Tex. 2007). And, in interpreting such policies, courts distinguish between the

outright loss or conversion of property and a temporary loss or a "loss of use." *See Colin v. Am. Empire Ins. Co.*, 26 Cal. Rptr. 2d 391, 408 (Cal. Ct. App. 1994) (collecting cases).

Westport insists that the Court may not look to cases dealing with commercial liability policies. Instead, they argue that the phrase "loss of use" should be given its plain and ordinary meaning. *See Fed. Ins. Co. v. Srivastrava*, 2 F.3d 98, 101 (5th Cir. 1993). Admittedly, insurance contracts are subject to the general rules of contract construction and the terms of an insurance contract are only subject to interpretation when they are ambiguous. *See Balandran v. Safeco Ins. Co. of Am.* 972 S.W.2d 738, 741 (Tex. 1998). In determining whether an ambiguity exists, the contract may be read in light of the surrounding circumstances. *See id.* Westport acknowledges that the phrase "loss of use" is not defined within the policy. Additionally, Westport does not contest the Cotten Schmidt defendants' assertion that the purpose of exclusion D is to prevent the policy's coverage from extending to events generally covered by a commercial liability policy. If this is in fact the purpose of the exclusion and the intent behind its language, the Court is bound to give the exclusion that effect. *See id.* And, as the cases cited by the Cotten Schmidt defendants demonstrate, there is a difference between defining coverage in terms of loss of property and loss of use. Given this context, the Court looks to the manner in which other courts have interpreted the phrase "loss of use."

Indeed, as the Cotten Schmidt defendants posit, the difference between the policy in this case and commercial liability policies generally weighs in favor of concluding exclusion D does not apply. Cases interpreting "loss of use" in commercial liability policies do so in the context of evaluating whether a claim is covered in the first instance. In that context, policy terms are construed broadly in favor of coverage. *See Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 666 (Tex. 1987). Despite this rule of construction favoring the insured, where insureds have argued that "loss of use" includes coverage for claims based on the taking of property, such as conversion, courts have denied coverage. *See Nortex Oil & Gas Corp. v. Harbor Ins. Co.*, 456 S.W.2d 489, 491 (Tex. Civ. App.–Dallas 1970, no writ.) (concluding that a policy which covered, inter alia, "loss of use of property" did not cover a claim against the insured based on its conversion of third-party oil); *see also Md. Cas. Co. v. Tex. Comm. Bancshares, Inc.*, 878 F. Supp. 939, 942-43 (N.D. Tex. 1995) (concluding that a policy that covered "loss of use of property" did not cover an insured bank's alleged conversion of trust property).

In the current case, the Court is faced with interpreting "loss of use" in the context of an exclusion. An insurance policy's exclusions are construed against the insurer in favor of coverage. *See Barnett*, 723 S.W.2d at 666. The Court concludes that if "loss of use" does not include conversion-type claims when construed favorably to the insured, *a fortiori*, the phrase cannot

27

be taken to exclude coverage for conversion type claims when being construed against the insurer.

D.   Conversion Exclusion

Exclusion H excludes from coverage any loss due to "conversion, misappropriation or commingling of funds." (Def. Mtn. App. at 14.)  The petition in the underlying suit clearly alleges conversion as a cause of action. (Pltf. Mtn. App. at 5.) Therefore, Westport argues, the claims against the Cotten Schmidt defendants are excluded from coverage and it owes them no duty to defend.

But as noted by the Cotten Schmidt defendants, Westport's argument calls upon the Court to read the clause as stating coverage is excluded regarding *any* conversion and any misappropriation generally, but only for the commingling *of funds*. Given the similarity of the acts listed, and the context of the policy and exclusion H--a professional liability policy with the apparent intent of excluding coverage of the improper handling of client funds--it would seem inconsistent to limit only "commingling" with the qualifier "of funds."

This is particularly true because Westport's construction of the policy turns on the lack of a comma between "commingling" and "of funds."  *See Sorbanes Recovery Pool I, LLC v. Todd & Hughes Constr. Corp.*, 509 F.3d 216, 223 (5th Cir. 2007) (describing the "last antecedent rule" and its "grammatical corollary" which

provide that a limiting term is ordinarily read as modifying only the noun that it immediately follows but that a modification set off by a comma suggests the modification applies to the entire list). Yet, in its arguments regarding the policy's "wrongful act," Westport makes just the opposite argument. The wrongful-act clause provides that the policy covers "any act, error, omission, circumstance, Personal Injury or breach of duty in the rendition of legal services." Westport argues that the phrase "in the rendition of legal services" modifies the entire preceding list of actions in spite of the fact that there is no comma between the modifying phrase "in the rendition of legal services" and the actions it modifies.

Finally, in interpreting the policy, the Court is unwilling to place undue weight on the policy's placement of commas because such placement appears generally to have been less than deliberate. For instance, although it is grammatically required, neither the wrongful-act clause or exclusion H uses a comma after the act named preceding the conjunction. *See* Strunk & White, The Elements of Style 2 (4th ed. Allyn & Bacon 2000) (discussing use of commas in a series with a single conjunction). Resolving conflicting reasonable constructions in favor of coverage as it must, the Court concludes that the underlying suit is not excluded from coverage by exclusion H. *See Nat'l Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991) ("If an exclusion is ambiguous the court "must adopt the contruction . . . urged by the insured as

long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent.").

## IV. Exclusion A, Indemnity, and the Need for a Stay

Exclusion A provides that the policy does not cover "any criminal, dishonest, malicious or fraudulent act, error, omission or PERSONAL INJURY committed by an Insured." (Pltf. Mtn App. at 8.) Both sides agree that this exclusion is only applicable to the duty to indemnify because it only applies when the insured has been adjudged to have committed the named acts. (*Id.*) Under Texas law "the duty to indemnify is justiciable before the insured's liability is determined in the liability lawsuit when the insurer has no duty to defend and the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify." *Farmers Tex. County Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 84 (Tex. 1997). Having concluded Westport has a duty to defend the Cotten Schmidt defendants, the Court does not address exclusion A. *See id.; see also Northfield*, 363 F.3d 527-28 (noting the duty to indemnify is separate and distinct from the duty to defend and that while the duty to defend is determined by comparing the policy to the pleadings, the duty to indemnify is based on the facts adjudicated in the underlying suit). Because the remainder of this litigation deals with Westport's duty to indemnify the Cotten Schmidt defendants, which turns on the facts

to be adjudicated in the underlying suit, the Court GRANTS the Cotten Schmidt defendants' request for a STAY. Further, in an effort to manage this Court's docket more efficiently, the above-styled and numbered cause will be administratively closed, to be reopened after the underlying suit has been decided.

V.  Conclusion

Accordingly, the Court concludes that Westport owes the Cotten Schmidt defendants a duty to defend them in the underlying suit. Having concluded a duty to defend exists, the Court does not reach the question whether Westport owes a duty to indemnify.  As a result, the Court GRANTS the Cotten Schmidt defendants' motion for partial summary judgment and DENIES Westport's motion for summary judgment.  Finally, because the decision of the question of Westport's duty to indemnify must be delayed until the underlying suit is decided, the Court GRANTS the Cotten Schmidt defendants' request for a STAY and ADMINISTRATIVELY CLOSES the above-styled and -numbered cause, to be reopened when the underlying suit is decided.

SIGNED March 18, 2009.

_Terry R. Means_
_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE